300 So.2d 752 (1974)
F. DeWitt MILLER, Jr., et al., Appellants,
v.
J. Vern WILLIAMS and Gary A. Watterson D/B/a Williams, Sheffield & Watterson, a Partnership, Appellees.
No. U-269.
District Court of Appeal of Florida, First District.
September 12, 1974.
Rehearing Denied October 11, 1974.
*753 Murray M. Wadsworth, and M. Stephen Turner, of Thompson, Wadsworth & Messer, Tallahassee, for appellants.
Stanley Bruce Powell, of Douglass & Powell, Tallahassee, for appellees.
BOYER, Judge.
We review by interlocutory appeal a partial summary judgment entered by the trial court in an action wherein the plaintiffs (appellees here) sought damages for breach of contract and an accounting arising out of an employment contract between plaintiffs as employer and appellant Miller as employee.
Appellees have also filed a motion to strike appellants' reply brief on the ground that it was not timely filed. Our examination of the file reveals that said brief was not timely filed, therefore it is stricken.
Appellees, constituting a partnership, are engaged in the practice of accounting, a profession.
In early 1967 one S. Curtis Green, a graduate accountant, became employed by appellees. He was charged with the responsibility of servicing the accounts of certain clients of appellees. In June of 1967 appellant Priester, a certified public accountant, became employed as a salaried employee of appellees. He too was assigned the responsibility of servicing the accounts of various clients of appellees, some of whom he "brought to that firm." On June 19, 1967 appellant Miller became employed by appellee, his compensation to be a percentage of his gross billings from services performed. Miller had theretofore been a self-employed certified public accountant in Tallahassee for five years. It was anticipated that he would perform services for clients whom he had theretofore serviced as well as for clients of appellees.
On November 21, 1967 Miller, designated as an employee, entered into an employment agreement with appellees, as employer, the pertinent provisions of which are as follows:
"1. The employee, for consideration herein stated, agrees to work for the employer as a Certified Public Accountant under the direction and control of the employer and to devote his full time to the business and practice of the employer.
* * * * * *
"3. Attached to this agreement is a schedule of the employee's clients prior to his employment with the employer. During the employee's employment, these clients shall be considered clients of the employer and shall be so considered for as long as the employee remains in the employ of the employer. It is agreed that if the employee or employer terminates the employee's employment that the accounts listed on the schedule attached shall be considered the employee's accounts and upon request the files on the attached list will be delivered to the employee by the employer after copies of said files have been made by the employer.
* * * * * *
"5. Either the employer or the employee can terminate this agreement by giving thirty (30) days notice of termination to the other in writing.
"6. In the event of the termination of employment, the employee agrees that he shall not solicit any of the clients of the employer and will in no way interfere with the relationship of the employer *754 and the clients of the employer. It is agreed that the employee shall be entitled to the exception from this agreement, the clients listed on the attached schedule which clients are agreed to be in the event of termination, the property of the employee, and the employer agrees that it will not solicit nor interfere with the relationship of the employee and those clients upon termination. It is mutually understood that some clients of the employee may desire that the employer continue to perform their accounting service. Upon request by the employee's client or clients, the employer may continue to perform these services at the employer's option. In the event the employer does continue to perform accounting services for the employee's clients after the employee's termination of employment, one-third (1/3) of any fees so generated during the three years following termination of the employee's employment shall be paid to the employee as collected.
"Likewise, the employee may continue to perform accounting services, at his option, for clients of the employer at their request. If he does perform accounting services for clients of the employer requesting same, one-third (1/3) of any fees so generated during the three years following termination of the employee's employment shall be paid to the employer as collected."
Attached to the agreement is a three-page exhibit, being a schedule of Miller's clients prior to his employment by appellees.
Green and Priester were both witnesses to the signatories of said contract.
One W.D. Baxter, the owner of several enterprises, and a long time friend of Miller's, spoke with Miller "about the possibility of engaging him to perform [sic] accounting services" prior to Miller's employment contract with appellees. He thereafter sought out Miller and asked that he perform whatever accounting services Baxter's business enterprises needed. Baxter did not know anyone else in, or connected with, appellees' accounting firm.
Neither Priester nor Green entered into any written contractual arrangement with appellees.
On October 1, 1970 Miller, Priester and Green terminated their employment with appellees and Priester and Miller formed a professional association known as Priester & Miller, Chartered, each owning fifty percent of the stock thereof. That firm employed Green.
Although Miller owns fifty percent of the stock of the professional association, he draws a smaller salary than does Priester.
While most of the clients who had been serviced by Miller prior to his employment by appellees elected to follow him to his new firm, some remained with appellees. Some of the clients which Miller initially commenced to service during his employment by appellees, particularly W.D. Baxter, also followed him to the new firm. Further, some of the clients who had been serviced by Priester and Green while they were affiliated with appellees followed them to the new firm.
The parties agree that solicitation by accountants is unethical and subject to disciplinary action and all parties have disclaimed any suggestion of solicitation to be here involved. In short, there is no contention of solicitation nor of other unethical conduct on the part of any of the parties, nor on the part of Green.
The facts being as above stated, the appellees (plaintiffs below) contend that Miller, Priester, Green and the professional association are all subject to the terms of Miller's contract with appellees and that appellees are entitled to an accounting under numbered paragraph 6 of that contract for one-third (1/3) of all fees generated during the three-year period following termination of Miller's employment by virtue of the servicing by either Miller, Priester, *755 Green or the professional association of the accounts of clients who were serviced by Miller, Priester or Green during their employment by appellees, except those listed on the exhibit attached to the contract, being the clients who were serviced by Miller prior to his affiliation with appellees.
Appellants, defendants below, deny that appellees are entitled to an accounting, and counterclaim for an accounting by appellees for fees generated from those clients formerly serviced by Miller who elected to remain the clients of appellees.
Upon all parties filing motions for summary judgments, the trial judge entered a partial summary judgment requiring both plaintiffs and defendants to account to the other, finding, inter alia, as follows:
"5. Professional service corporations, authorized by Chapter 621, Florida Statutes, are designed primarily for the purpose of allowing various professions to form organizations that would legitimately qualify for certain tax or retirement advantages available to corporations. Street v. Sugarman, 202 So.2d 749 ([Sup.Ct.Fla.] 1967). However, it is clear that individual practitioners are not relieved of any of their professional obligations, liabilities, or limitations by becoming a shareholder in such a corporation. See Sec. 621.06 and Sec. 621.07, Florida Statutes. By the same token a shareholder who has contractually obligated himself to another to share in certain earnings from professional services to persons who had been clients of that other party cannot be relieved of those obligations by merely forming a corporation with others who have no such contractual obligations. Also, the corporation which has a shareholder burdened with such a contract and which receives all of the professional earnings from such shareholder cannot disclaim the burdens of the contract pertaining to such earnings. The corporation in this case makes no differentiation in the production of the shareholders or the origin of the clientel or who performs the service so far as receipts are concerned. They all reach a corporate pot from which salaries to both stockholders are paid and net earnings may accrue to the benefit of both.
"6. It is the conclusion of the Court that receipts of the corporation from clients who had been the clients of plaintiff and which were not the clients of Miller set forth on the list attached to the contract are subject to the provisions of Miller's contract, regardless of whether the client came to Miller or to another stockholder or an associate of the P.A. and regardless of whether Miller or some other accountant in the firm performs the service."
Appellants first contend that the disputed provision in the contract of employment between appellees and Miller is invalidated by the provisions of Florida Statute 542.12, urging that the contract constitutes an unlawful restraint. We have carefully considered the many cases cited from other jurisdictions as well as the Florida cases of Bergh v. Stephens, Fla. App. (1st) 1965, 175 So.2d 787; Akey v. Murphy, Fla.App. (2) 1970, 229 So.2d 276; White v. Allen, Fla.App. (4th) 1970, 232 So.2d 766 and Akey v. Murphy, Sup.Ct.Fla. 1970, 238 So.2d 94. However, none of those cases reach the point here involved. It will be noted that there is no restriction in the contract upon Miller's continued practice of his profession. The provision, as provided in the contract, relating to the accounting by one to the other (a reciprocal agreement it will be noted) for a percentage of the fees generated from servicing the clients of one who has elected to be serviced by the other is not a restriction but simply a business arrangement incident to the continued practice of the parties respective accounting professions.
While it is laudable, and indeed essential, that we forever maintain a distinction between the carrying on of a business and *756 the practice of a profession (see definitions and distinctions appearing in Bergh v. Stephens, supra, and in Odess v. Taylor, 1968, 282 Ala. 389, 211 So.2d 805) nevertheless it is also imperative that we constantly bear in mind that there is a business aspect to the successful pursuit of every profession and if the business aspect is long neglected the profession is not apt to long endure. In fact, it is necessary to remain constantly aware of the business aspect so that it will not become so intertwined with the professional aspect as to obliterate the distinction.
Having held that the disputed provision of the subject employment contract as it is written in the contract does not constitute an unlawful restraint as provided in Florida Statute 542.12, we hasten to add that were the provisions of the contract, as written, to be construed as interpreted by the trial judge, then the contract would constitute an unlawful restraint and would therefore be invalid.
As interpreted by the trial judge any former client of appellees who independently choose to retain the services of any accountant affiliated in the practice with Miller would be subject to the agreement. Thus Miller, were the contract properly so interpreted, would have an albatross around his neck. No other accountant would be willing to enter into practice with Miller for fear that he would be liable for part of the fees generated from servicing some former client of appellees, though such clients should come to him entirely independent of Miller. Such an interpretation clearly is a substantial impairment upon Miller's further employment and association, and if the contract were so construed it would be invalid under F.S. 542.12.
There is nothing in the record to suggest that the professional association was formed for the purpose of evading the provisions of the contract between appellees and Miller. The trial judge himself found "that none of the undisputed facts infer any intentional dishonest act on the part of anyone, or that there was a scheme of solicitation to acquire clients who had previously been those of the opposing parties." He further found that "for purposes of this motion it is assumed that all clients which either remained with the plaintiff or which changed to the P.A. did so without pressure or encouragement." Accordingly, there is no basis in the record for foisting upon Priester, Green or the professional association the provisions of the contract between appellees and Miller. It is true that the scope of the disputed provision could not be evaded through the subterfuge of a one-man corporation, but neither can it be expanded beyond that which the language provides and requires. Suppose, for instance, Miller should become a junior partner or an employee in a large Washington, D.C. accounting firm to which one of appellees' former clients should go because of that firm's particular expertise in governmental matters: Surely it could not be seriously contended that either Miller or the firm would thereupon become liable to account by virtue of the subject contract. Clearly, the disputed provision goes to Miller's personal involvement with former clients. In order for it to come into play he must be connected in some definitive way with the continued servicing of their accounts. The clients must either come to the firm because of him or he must service them himself.
We hold, therefore, that any clients whose accounts were serviced by either Priester or Green during their employment by appellees who thereafter sought their services as employees of Priester & Miller, Chartered, are not subject to the accounting provision contained in the disputed contract. Of course, neither are appellees accountable to appellants, or any of them, for any portion of any of the fees derived from clients serviced by Priester or Green during the period they were employed by appellees.
Fees derived from the clients whose names appear on the list attached to the *757 subject contract present no problem. All parties concede that appellants are not accountable to appellees for any fees derived from any of those clients since Miller's termination of employment and it is clear from the contract that appellees are accountable to Miller for one-third of any fees derived from any of such clients who elected to become clients of appellees after termination of the employer-employee relationship.
However, the question arises: "What about clients who sought the services of Miller after he entered into the contract with appellees and during the term of that contract?" The answer to that question involves factual determination. The subject contract does not define "employer's clients" nor "employee's clients." It merely provides that during Miller's employment by appellees the clients appearing on the list "shall be considered clients of the employee and shall be so considered for as long as the employee remains in the employ of the employer." Although it is clear that the parties intended that upon termination of the employer-employee relationship those clients would be considered as clients of Millers, it is not quite so clear that Miller was prohibited, during the term of employment, from "obtaining" other clients. It is apparent, therefore, that any client whose account was turned over by appellees to Miller for servicing during the period of his employment remained one of appellees' clients. On the other hand, any client who specifically sought the professional services of Miller because of acquaintance with him, personal confidence in him, or other such relationship, although initially serviced during Miller's period of employment by appellees, remained Miller's client upon termination of the employment. Obviously, any client who sought the services of appellees' firm during the period of Miller's employment, not specifically acquainted with Miller nor seeking the professional services of Miller, would remain appellees' clients, notwithstanding that Miller might have serviced the account during his employment.
The determination of such factual issues can only be resolved in the trial court upon the taking of appropriate evidence.
The partial summary judgment appealed is hereby reversed and this cause is remanded to the trial court for further proceedings consistent herewith.
JOHNSON, J., concurs.
RAWLS, C.J., dissents.
RAWLS, Chief Judge (dissenting).
It is my view that the subject contract, by its clear and unequivocal terms, is binding upon Miller and upon the "partnership" composed of Priester and Miller.[1] By his agreement, Miller specifically retained the schedule of clients that he was servicing prior to entering the employment of Williams, Sheffield & Watterson. Upon entering into the employment of Williams, et al., Miller became their employee *758 and agreed "... to work for the employer as a Certified Public Accountant under the direction and control of the employer and to devote his full time to the business and practice of the employer." Thus, Miller at this point in time could not, by the terms of the instant contract of employment, acquire any clients who sought the services of Miller. Such clients could only seek Miller's services through his employer, Williams, et al. When Baxter, "a long time acquaintance" of Miller's (not a long time friend as stated by the majority), sought out Miller to service his account, he could only procure Miller's services by retaining the accounting firm with which Miller was an employee.
As to the rationale of the majority that the contract as interpreted by the trial court would result in wrapping an albatross around the neck of Miller, I can only say that this learned man voluntarily entered into the contract and accepted not only the benefits but also the liabilities of same. Upon severing his relationship with his employer, Miller departed with the benefits and liabilities of his agreement and transported these benefits and liabilities into his new partnership venture.
I would affirm the trial judge's partial summary judgment.
NOTES
[1] Although entitled a "Professional Service Corporation", this method of professional persons joining together to practice their profession does not possess any of the traditional shelters of a corporate entity. As stated by Justice Thornal in In Re The Florida Bar, 133 So.2d 554, 556, 4 A.L.R.3d 375 (Fla. 1961): "We construe the legislation ... as a frank and forthright effort to adapt business and professional relationships to the requirements of the Internal Revenue Service in order that the members of such businesses and professions may be placed on an equal footing with other taxpayers." In State v. Dawson, 290 So.2d 79, 82 (1 Fla.App. 1974), Associate Judge Drew, speaking for this Court, reiterated the foregoing principle of law when he stated: "A study of the background and history of the Professional Service Corporation Act of Florida establishes beyond doubt that it was enacted for the purpose of providing tax advantages to those in the learned professions that otherwise would be unavailable to them... . everything essential was done by the legislature and the sponsors of such legislation to preserve the non-corporate status... ." Also see Street v. Sugerman, 202 So.2d 749 (Fla. 1967); and Re Florida Bar, 133 So.2d 554, 4 A.L.R.3d 375 (Fla. 1961).